E. H. RAABE, Plaintiff,

v.

FLORIDA EAST COAST RAILWAY COMPANY, a Florida corporation, Defendant.

No. 64–112–Civ–J.

United States District Court
M. D. Florida,
Jacksonville Division.

July 11, 1966.

Allan Milledge, Rutledge & Milledge, Miami, Fla., for plaintiff.

William B. Devaney, Steptoe & Johnson, Washington, D. C., and J. Turner Butler, Jacksonville, Fla., for defendant.

## OPINION

McRAE, District Judge.

Plaintiff, E. H. Raabe, was a trainman in the employ of the defendant, Florida East Coast Railway Company (F.E.C.) prior to April 1960. He was suspended from work in that month and was finally discharged in August of that year for not rendering satisfactory service. On appeal, the First Division of the National Railroad Adjustment Board found that although Raabe had in fact failed to perform certain duties, the F.E.C. had not followed the correct procedure in discharging Raabe; therefore, the Board ordered him reinstated and recompensed for all time lost. When the F.E.C. failed to comply with the Board's order, Raabe brought this action under 45 U.S.C. § 153(p) to compel it to do so.

The pertinent disciplinary provisions in effect at the time in dispute between F.E.C. and its employees belonging to the Brotherhood of Railroad Trainmen, of which Raabe was one, are found in the so-called Circular No. 1 and article 34 of the collective bargaining agreement. The circular provides in part as follows:

> Effective October 15, 1927, discipline by actual suspension with loss of pay to the * * * employees will be abandoned. Thereafter, except in cases necessitating dismissal from the service, discipline will be applied by reprimand or by demerits entered against records of employees, both of which may be canceled by subsequent good service as hereinafter stated.
>
> * * * * * *
>
> An accumulation of ninety (90) demerits will be taken as evidence that the employee is not rendering satisfactory service, and suspension from duty will follow, at which time the entire record will be reviewed and such further action taken as the circumstances warrant.

Article 34(c) provides in part as follows:

> When a trainman * * * is charged with an offense * * * he

will be promptly notified in writing of the charges against him. * * * The investigation [hearing] will be held within ten (10) calendar days of the date the employee is charged with an offense. * * * Decision will be rendered within ten (10) calendar days after completion of investigation. The time limits provided in this paragraph may be extended by mutual agreement. Discipline shall consist of reprimand, demerits or dismissal.

As of February 28, 1960, Raabe had accumulated 85 demerits. He was assessed 5 more on March 4, 1960, to be effective as of February 29, the date of the alleged offense. Raabe was charged with having accumulated 90 demerits on April 17, an investigation was held on April 18, and Raabe was suspended from work on April 20. Raabe's appeals on the demerit entries [1] were denied by the highest reviewing officer on August 5, and four days later Raabe was notified that his services were terminated at once.

The National Railroad Adjustment Board interpreted the sentence in article 34(c) that "decision will be rendered within ten (10) calendar days after completion of investigation" to mean that the discipline selected (here dismissal) must be imposed within this 10 day period or else is waived. Moreover, suspension pending appeal and then dismissal, the sequence in this case, violated the no-suspension policy of Circular No. 1, as well as the article 34(c) requirement that "discipline shall consist of reprimand, demerits or dismissal." The Circular No. 1 provision that "suspension from duty will follow" the accumulation of ninety demerits apparently was not considered to be inconsistent [2] or if inconsistent was considered to be overridden by the subsequently adopted article 34(c) provision and the general no-suspension policy of the circular.

The Board, by adopting this interpretation, may have rejected its previous interpretation in Award 16,710 to the effect that dismissal would not be allowed until after the appeal period (ending August 5 in this case) on all demerits had run. The F.E.C. claimed it had relied upon this prior award and thus waited until after the August 5 affirmance before dismissing Raabe. The Board correctly pointed out, however, that in order to have relied reasonably and in good faith on the prior award, the F.E.C. should have refrained from charging Raabe with the accumulation of 90 demerits until the five demerits assessed on March 4, 1960 had become final (which they did on August 5, 1960).

■ Citing Gunther v. San Diego & Ariz. E. Ry., 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965), Raabe moved for summary judgment on the issue of liability. *Gunther* teaches that a district court must give a Board decision "the same finality that a decision of arbitrators would have." 382 U.S. at 263, 86 S.Ct. at 372. In other words, the Board's interpretation of a collective bargaining agreement must be sustained, even if the court disagrees with it, unless the Board's interpretation is "wholly baseless and completely without reason," 382 U.S. at 261, 86 S.Ct. at 371, or manifests an infidelity to the language of the contract, see United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

■ Although not necessarily agreeing with the Board's interpretation that article 34(c) requires the railroad to act on its decision as well as make and announce the decision within 10 days of the

---

1. In addition to the 5 demerits assessed on March 4, 1960, Raabe had also been assessed 30 demerits on April 19, 1960, making a total of 120 demerits as of the latter date. Both assessments were sustained by the highest reviewing officer and by the Board.

2. The provision could be rationally interpreted to apply only to the time after all 90 demerits became final (here, August 5).

investigation and that limited suspension allowed by Circular No. 1 does not apply in this case, this court can by no means say that the interpretation is "wholly baseless and completely without reason." In addition, the Board was clearly correct in ruling that the F.E.C. had not relied in good faith on Award 16,710. And, the inconsistency of a later award, approving a procedure similar to that followed by the F.E.C. in dealing with Raabe, does not make the interpretation any less rational. Therefore, summary judgment on the issue of liability was appropriately entered for plaintiff.

█ The Board's remedy in the Raabe award was reinstatement and compensation "for all time lost" from April 20, 1960, to the time of reinstatement. The F.E.C. moved to set aside the partial summary judgment on the ground that the Board's remedy was much too broad. This court recognizes that it is harsh to require the railroad to reinstate a person who had accumulated 120 demerits, far more than enough to allow dismissal, and to pay him a considerable amount of money. Yet, again it can not be said that the Board's action was irrational; the motion to set aside judgment was appropriately denied. The cases cited by the F.E.C. in support of its position are not controlling, for in each instance the court substituted its interpretation of the collective bargaining contract for that of the Board. *Gunther* no longer allows this approach.

█ The Board did not determine the amount of compensation due Raabe; rather, according to *Gunther*, it is the function of this court to determine the size of the money award. 382 U.S. at 264–265, 86 S.Ct. 368. Raabe was reinstated on or about February 12, 1966, but, by pretrial stipulation, the parties have agreed to consider the wages lost only through January 31, 1966. Thus,

the initial question to be faced is the determination of wages Raabe would have earned from April 20, 1960, to February 1, 1966.

The problem is complicated by the fact that the F.E.C. was struck by various unions during the period. Raabe admitted at trial that he would not have worked during any period when his union was on strike. The Brotherhood of Railroad Trainmen, Raabe's union, was officially on strike from about April 5, 1963, to May 7, 1963, and from about July 10, 1963, to August 30, 1963. The so-called nonoperating unions, however, had struck the F.E.C. back on January 23, 1963, and members of the operating unions, including the Brotherhood of Railroad Trainmen, honored their picket lines. Not until 1964 did some members of the Brotherhood return to work and not until 1965 did they return in substantial number.

At the end of May 1963, soon after the Board's decision in this case was announced, Raabe called Mr. Raymond W. Wykoff, Vice President and Director of Personnel of the F.E.C., and asked when the F.E.C. was going to make the award effective. Mr. Wykoff replied that the railroad was not satisfied with the award and was going to request a rehearing. Raabe next contacted the F.E.C. on November 14, 1964, bidding on two jobs. The railroad refused to consider his bids.

Raabe's testimony that he would not work while the Brotherhood of Railroad Trainmen were on strike, the fact that during 1963 almost every member of the Brotherhood honored the picket lines of the striking unions, and the fact that Raabe did nothing about trying to return to work after the telephone conversation with Mr. Wykoff lead this court to conclude that had he not been discharged, Raabe would not have worked from January 23, 1963, to November 14, 1964.[3]

---

3. If one of Raabe's bids had been accepted, he could not have actually started working for a week or two, but the 14th still seems the appropriate cut-off date.

The determination of what Raabe would have earned during the time he would have worked is necessarily an inexact calculation. Various formulas were suggested, but, after considering those suggested, this court believes that the best indicator is the earnings of the person on the seniority roster directly below Raabe. Accord, Brotherhood of R. R. Trainmen v. Southern Ry., Civil No. 10318, N.D.Ala., May 28, 1965. Because of individual preferences, that person may have bid for different jobs than Raabe would have, but use of any other formula would involve the same problem. Moreover, by comparing his earnings with the earnings of those on the roster near him, it is evident in this case that his earnings are not out of line—that his pay was neither significantly inflated nor deflated because of some personal quirks in work habits.

The person directly below Raabe on the seniority roster was T. A. Herndon. Except for the strike period, Herndon worked full-time for the F.E.C. until February 1965, at which time he quit. The next man on the seniority roster was J. R. Brown, but he did not return to work after the strike until August 1965. Thereafter, for the months February through July 1965, the closest man below Raabe with respect to seniority was M. E. Walls. Taking the earnings of T. A. Herndon from April 20, 1960, to January 23, 1963 (including vacation pay for 1963), and from November 14, 1964, to February 1965; the earnings of M. E. Walls from February 1965 to August 1965; and the earnings of J. R. Brown from August 1965 to February 1966, the court concludes that Raabe would have earned $36,278.85 had he not been discharged.[4]

A considerable amount of testimony and argument was presented by both sides on the question of whether wages actually earned by Raabe during the period in dispute should be deducted from the amount he would have earned if he had worked for the railroad. The most that one can conclude from this general morass is that the Board occasionally specifically grants net awards, occasionally specifically grants gross awards, and mostly does not rule one way or the other. In this case, the Board did not consider or specifically rule on the issue and the collective bargaining agreement did not cover the matter.

In cases of this type, courts have almost universally deducted wages actually earned or those that should have been earned by the exercise of reasonable diligence. See, e. g., Brotherhood of R. R. Trainmen v. Southern Ry., Civil No. 10318, N.D.Ala., May 28, 1965; Brady v. Trans World Airlines, Inc., 244 F.Supp. 820 (D.Del.1965). Not only is this procedure in accord with the common law rule of mitigation of damages but it also is consistent with the procedure followed by the N.L.R.B. in cases under its jurisdiction. See, e. g., N. L. R. B. v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951) (dictum). Although for some purposes procedures and policy under the N.L.R.A. is different from those under the R.L.A., this court can see no reason why back pay determinations under the acts should be by different methods.

Raabe exercised reasonable diligence in seeking other employment, and in the periods from April 20, 1960, to January 23, 1963, and from November 14, 1964, to February 1, 1966, he received approximately $3,546.37 in wages.[5]

Defendant also urges that $3315 in unemployment compensation received by Raabe from the Railroad Retirement Board and $3275 in strike benefits received by Raabe from the union should also be deducted. Under N.L.R.A. procedure, both amounts would be collateral benefits and not deductible. See N. L. R. B. v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337 (1951); N. L. R. B. v. Brashear Freight Lines, 127 F.2d 198 (8th Cir. 1942).

---

4. For a breakdown, see Appendix.

5. For a breakdown, see Appendix.

█ It is not clear from the record whether the union benefits were payments relating solely to the period Raabe would not have worked for the railroad because of the strikes; even if they were not, the amount should not be deducted because of their collateral nature. If collateral losses are not to be considered, neither should collateral gains.

█ The deduction of the unemployment compensation payments, however, should be allowed. Unlike the situation in the N.L.R.A. cases, federal law authorizes the fund from which Raabe was paid and federal law requires the carrier (here the F.E.C.) to reimburse the Railroad Retirement Board in full for the amount of benefits paid to Raabe by the Board for which the F.E.C. is held responsible. The F.E.C. should not have to pay twice; therefore, the amount due the Railroad Retirement Board shall constitute a lien on the judgment awarded Raabe.

█ Raabe argues that he should be awarded prejudgment interest in order to make him whole; this court agrees. In the few reported cases concerning money awards for unlawful discharge under the R.L.A., no mention has been made of prejudgment interest. And, prior to 1962, the N.L.R.B. did not grant prejudgment interest as part of back pay awards. The N.L.R.B. changed its policy in that year, however, and has awarded 6% interest since. See Iris Plumbing & Heating Co., 138 N.L.R.B. 716 (1962). Various courts of appeals have upheld the authority of the N.L.R.B. to award prejudgment interest. E. g., Philip Carey Mfg. Co., Miami Cabinet Div. v. N. L. R. B., 331 F.2d 720, 729–731 (6th Cir.) cert. denied, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964); Reserve Supply Corp. of L. D. v. N. L. R. B., 317 F.2d 785, 789–790 (2d Cir. 1963). The Fifth Circuit apparently has not discussed the issue, but many times has enforced awards containing prejudgment interest. See, e. g., N. L. R. B. v. Durant

Sportswear, Inc., 358 F.2d 729 (5th Cir. 1966), enforcing 147 N.L.R.B. 906, 920 (1964).

Although these decisions have merely held that the N.L.R.B. has the authority to award prejudgment interest in its discretion, the reasoning is based on the proposition that the granting of such interest in this type of case is in conformity with general principles of law —that back pay awarded is not a fine or penalty but wages lost by the employee because of the employer's wrong; that back pay is thus in the nature of a debt and, moreover, indebtedness that arises out of a statutory obligation owed the employee by the employer. Clearly the interest is needed in order to make the employee whole. Absent any expressed policy in the R.L.A. to the contrary, and this court finds none, this reasoning applies equally to compensation awarded employees reinstated by the National Railroad Adjustment Board.

The N.L.R.B. computes the wages that would have been earned, wages that were earned in outside employment, and interest on the difference on a quarterly basis. Because of the complexities involved and the inadequacy of the record in this case, interest and outside earnings set-offs shall be computed on a yearly basis. Thus, Raabe should recover $4,943.77 plus interest from the end of 1960, $8,576.84 plus interest from the end of 1961, $7,481.04 plus interest from the end of 1962, $698.17 plus interest from the end of 1963, $1,419.85 plus interest from the end of 1964, $8,808.57 plus interest from the end of 1965, and $804.24 for the year 1966.

█ Section 153(p) of Title 45 provides that "[i]f the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee, to be taxed and collected as a part of the costs of the suit." The plain language of the statute contemplates that the attorney's fee be granted in addition to the amount awarded Raabe and not out of the recovery. Accord, Brotherhood of Rail-

road Trainmen v. Southern Ry., Civil No. 10318, N.D.Ala., May 28, 1965; Thomas v. Southern Ry., Civil No. 64–120, N.D.Ala., June 1, 1965. Such provision is part of "a carefully designed procedure for reviewing money awards, one which will achieve the reviewing function without any significant expense to the employee or his union." Brotherhood of Locomotive Engineers v. Louisville & N. R. R., 373 U.S. 33, 41, 83 S.Ct. 1059, 1064, 10 L.Ed.2d 172 (1963).

Evidence presented at the final hearing with reference to attorneys' fees was not sufficiently adequate to enable the court to make a fair determination of the amount which has been earned by the attorneys for plaintiff. Accordingly, further proof will be required before a final decision is made with reference to the amount to be awarded.

Judgment will be entered in accordance with this opinion.

## APPENDIX

| Period of Time | Amount Raabe Would Have Earned With F.E.C. | Outside Earnings | Outside Employer | Net Amount Owed Raabe, Excluding Interest |
|---|---|---|---|---|
| 4/20/60–12/31/60 | $ 5,843.96 [1] | $847.34<br>52.85 [2]<br>———<br>$900.19 | Suwannee Steamship Co.<br>TMT Trailer Ferry, Inc. | $ 4,943.77 |
| 1961 | 9,292.84 | 350.00 [3]<br>116.00<br>250.00 [4]<br>———<br>716.00 | Suwannee Steamship Co.<br>Zev Israel Steamship Lines<br>Miscellaneous | 8,576.84 |
| 1962 | 9,048.72 | 905.60<br>20.33 [2]<br>120.00<br>271.75<br>250.00 [4]<br>———<br>1,567.68 | Sea Land Service, Inc.<br>TMT Trailer Ferry, Inc.<br>Ponte Vedra Inn<br>Stricklands<br>Miscellaneous | 7,481.04 |
| 1/1/63–1/23/63 | 810.67 | 112.50 [5]<br>———<br>112.50 | Stricklands | 698.17 |
| 11/14/64–12/31/64 | 1,419.85 | | | 1,419.85 |
| 1965 | 9,058.57 | 250.00 [4]<br>———<br>250.00 | Miscellaneous | 8,808.57 |
| 1/1/66–1/31/66 | 804.24 | | | 804.24 |
| TOTAL | $36,278.85 | $3,546.37 | | $32,732.48 |

[1] Although plaintiff's Exhibit 5 shows T. A. Herndon's earnings for this period as $5,692.61, this court adopts the amount listed in the pretrial stipulation.

[2] Total of earnings from TMT Trailer Ferry, Inc., for 1960 and 1962 was $73.18, the amount listed in plaintiff's answer to an interrogatory.

[3] Raabe's base pay was $278.00 per month, and he worked for Suwannee about 5 weeks in 1961. There is no evidence of any significant overtime pay.

[4] Plaintiff estimates miscellaneous earnings totaling $1,000 since his discharge, of which $200 to $250 was earned during the period from January 23, 1963, to November 14, 1964. Taking $250 as the appropriate figure for that period, the court has allocated the remaining $750 into the years 1961, 1962, 1965 in equal amounts.

[5] Raabe earned $300 while working at Stricklands during the first two months of 1963. Three weeks of work came before the strike at F.E.C. Therefore, ⅜ of the $300 is allocated to the prestrike period.