Rosa M. Figueroa DE ARROYO et al.,
Plaintiffs, Appellants,

v.

SINDICATO DE TRABAJADORES
PACKINGHOUSE, AFL–CIO, et al.,
Defendants, Appellants,

and

Puerto Rico Telephone Company,
Defendant, Appellant.

Nos. 7456–7458.

United States Court of Appeals,
First Circuit.

April 17, 1970.

A. J. Amadeo Murga, Santurce, P. R., for Rosa M. Figueroa de Arroyo and another.

Irving M. King, Chicago, Ill., with whom Eugene Cotton and Richard F. Watt, Chicago, Ill., Luis G. Estades, San Juan, P. R., and Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., were on brief, for Sindicato de Trabajadores Packinghouse, AFL–CIO, Distrito de Puerto Rico, and another.

Richard L. Marcus, Chicago, Ill., with whom Matthew E. Murray, Chicago, Ill., Fernando Ruiz-Suria, Antonio Bird, Jr., of San Juan, P. R., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., and McConnell, Valdes, Kelley & Sifre, San Juan, P. R., were on brief, for Puerto Rico Tel. Co.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Plaintiffs are seven telephone operators formerly employed by defendant Puerto Rico Telephone Company [hereinafter "Company"] at Mayaguez and members of defendant Sindicato de Trabajadores Packinghouse, AFL–CIO, and its local affiliate, Local 963 [hereinafter collectively "Union"]. They were discharged by the Company—one in September 1963 and the other six in April 1964—allegedly in contravention of the seniority provisions of the collective bargaining agreement between the Company and the Union. They immediately communicated the fact of their discharge to the Union but after the Union failed to take their claims through the grievance procedure, the plaintiffs filed suit, on November 22, 1965, against both the Union and the Company.[1]

A first jury returned special verdicts that the Company's dismissal of plaintiffs had violated the seniority provisions, and that plaintiffs had properly submitted their claims to the Union. A second jury found that the Union had breached its duty of fair representation —with regard to six of the seven plaintiffs—and awarded plaintiffs varying amounts for lost earnings, allocated in varying portions between the Company and the Union.

The Union appeals from the finding of a breach of its duty of fair representation and the assessment of damages; the Company appeals from the finding of improper discharge, the finding that the Union had breached its duty, and the assessment of damages; and the plaintiffs appeal on the ground that additional elements of damages—including reinstatement—should have been awarded. We consider the appeals in that order.

### The Union's Duty of Fair Representation

"Fair representation", conceived in a racial discrimination context in Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), has matured into a broader obligation for unions, most recently articulated in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Republic Steel v. Maddox, 379 U.S. 650, 652–653, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), had established that an employee under a collective bargaining agreement which provides exclusive remedies for breaches of that agreement must attempt to exhaust those contractual remedies before resorting to the courts. Vaca then made clear that the employee could overcome the employer's defense of failure to exhaust contractual remedies by proving that the employer had repudiated those remedies, or that the Union had—by a breach of its duty of fair representation—prevented the employee from exhausting those remedies, or that there was some other valid reason why the contractual remedies could be disregarded. Vaca v. Sipes, supra, 386 U.S. at 184–186, 87 S.Ct. 903; see Glover v. St. Louis-S. F. R. Co., 393 U.S. 324, 329–331, 89 S.Ct. 548, 21 L.Ed. 2d 519 (1969). Plaintiffs here sought to overcome this "exhaustion of contract" barrier by attempting to prove that the Union's "unfair representation" prevented the requisite exhaustion.

Vaca held that an employee does not have an absolute right to have his grievance taken through the grievance proce-

1. Subject matter jurisdiction against the Company is founded on § 301(a) of the Taft-Hartley Act, 29 U.S.C. § 185(a) (1964), and against the Union on 28 U.S.C. §§ 1331, 1337 (1964). See Brady v. Trans World Airlines, Inc., 401 F.2d 87, 94 (3d Cir. 1968), cert. denied, International Ass'n of Machinists v. Brady, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed. 2d 691 (1969).

dure;[2] unless the contract otherwise provides, the union has a range of discretion within which to determine that an employee's grievance is without merit. Vaca v. Sipes, *supra*, 386 U.S. at 191–193, 87 S.Ct. 903. Instead, the employee must prove arbitrary or bad faith conduct—variously referred to as the absence of honest purpose and judgment and/or the presence of hostility or discrimination—on the part of the union in order to prove that it has breached its duty. Vaca v. Sipes, *supra* at 190, 193, 87 S.Ct. 903; Humphrey v. Moore, 375 U.S. 335, 349–350, 84 S.Ct. 363, 11 L.Ed. 2d 370 (1964); Ford Motor Co. v. Huffman, 345 U.S. 330, 337–338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). However, while due care has not been made a part of the union's duty, the Court has "accept[ed] the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." Vaca v. Sipes, *supra* at 191, 194, 87 S.Ct. at 917; *see also* Republic Steel v. Maddox, *supra*, 379 U.S. at 652, 85 S.Ct. 614.

■ Applying this multifaceted standard of fair representation to our case, we can rule out any possibility of subjective bad faith, hostility, discrimination, or dishonesty on the part of the Union officials in failing to press plaintiffs' grievances. Mr. Sanchez—the Union official who was responsible for the Union's action in this case—appears from the record as a dedicated Union leader and legislator of manifold responsibilities. However, we are still left with the Court's recognition that arbitrary and

perfunctory handling by a union of an apparently meritorious grievance is not acceptable under the standard of fair representation.

■ This case reveals such handling. There was no evidence as to any plaintiff except Elsie Lugo. Bernier [3] that the Union ever investigated or made any judgment concerning the merits of her grievance. *See* Local Union 12, United. Rubber, Cork, Linoleum, and Plastic Workers of America A.F.L.–C.I.O. v. N.L.R.B., 368 F.2d 12, 17–18 (5th Cir. 1966). Its entire attention during 1964 centered on an NLRB proceeding aimed at preventing the Company from contracting out work involving the installation of new equipment. Just before the six plaintiffs were dismissed in April 1964, the trial examiner made his report which explicitly confined its relief to those dismissed because of subcontracting, to which the Union filed no exceptions. In the face of that report and clear evidence that plaintiffs were dismissed because of automation rather than subcontracting, the Union president inexplicably concluded that the NLRB proceeding would adequately protect plaintiffs' rights. Clearly the jury was warranted in finding that the Union's failure to press plaintiffs' grievances was the result of its arbitrary and perfunctory handling of them.[4]

The Union's suggestion that its pressing of these grievances during the pendency of the NLRB proceeding would somehow have jeopardized that avenue of relief is completely without merit.

2. While *Vaca* dealt with a union's refusal to take a processed grievance to arbitration, we see no reason to differentiate between the step of arbitration and earlier steps in the grievance procedure. The same principle applies: when the contract gives the union exclusive control over a grievance, the union must have that control in order for the whole process to function smoothly and effectively, which logic surely applies to all stages of the grievance procedure. *See* Comment, 17 Buffalo L.Rev. 165, 176–177 (1967).

3. The second jury's finding that the Union fulfilled its duty of fair representation

with regard to Miss Lugo is supported by evidence that the Union pressed her grievance to impasse immediately after her dismissal in September 1963. This failure to prove that the Union's unfair representation prevented her from exhausting contractual remedies bars her recovery against the Company in this case. *See* discussion in text *supra*.

4. The defendant's argument that the charge erred in focusing solely on the Union's action in failing to process the grievances might have been well taken had there been any rational basis for relying solely on the NLRB proceeding.

There is nothing inconsistent in trying to protect the jobs of the more senior employees vis-a-vis the less senior employees in one forum, while trying to protect the jobs of a larger number of employees vis-a-vis outside employees in another forum. Moreover, it is obvious that the Union does not breach its duty when it presses legitimate seniority claims, even though the effect of success is to jeopardize the jobs of those defined by the contract as less senior.

Finally, the Union—joined by the Company—insists that the six plaintiffs discharged in April 1964 failed to specify the seniority basis for their grievances when they complained to the Union. It is true that these plaintiffs did not testify that they told either Miss Acevedo, the local Union delegate, or Mr. Sanchez that less senior employees had been retained when they had been discharged. However, Miss Acevedo, who undoubtedly knew all 30 telephone operators in the Mayaguez unit, forwarded to Mr. Sanchez not only plaintiffs' names but their dates of hiring, which indicated that five had worked over three years and two had worked over ten years. Almost identical communication had been sufficient to initiate the seniority grievance for Miss Lugo, the least senior of the seven plaintiffs who was discharged in September 1963 and whose grievance was pressed by the Union. Moreover, the Union had been informed just before these dismissals that they would occur because of the new automatic dialing system, so that seniority was the only possible basis for a grievance. Had the Union given anything but the most perfunctory attention to these grievances, it would have been obvious that they raised a seniority claim. We are satisfied, therefore, that the jury could have found that these seniority grievances were submitted to the Union in compliance with the appropriate provision in the collective bargaining agreement.[5]

Accordingly, we conclude that the jury was entitled to find that the Union's failure to press the six plaintiffs' grievances was the result of its arbitrary and perfunctory handling of them, and thus a breach of its duty of fair representation preventing an exhaustion of contractual remedies and enabling these six plaintiffs (see n. 3) to maintain their suit against the Company.

### The Statute of Limitations

██ The Union contends, however, that even if it breached its duty of fair representation, plaintiffs' suit against it is barred by the one-year Puerto Rico statute of limitations for tort claims, 31 L.P.R.A. § 5298, since the Union's breach occurred over 19 months before plaintiffs filed suit on November 22, 1965. However, while International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (U.A.W.) A.F.L.–C.I.O. v. Hoosier Corp., 383 U.S. 696, 701–705, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966), established that § 301 suits should be governed by the state statute of limitations rather than some implied federal limitation period, the question left undecided for purposes of our case is which Puerto Rico statute of limitations applies to an employee's suit against his union for breach of its duty of fair representation, when such suit is a part of the employee's suit against his employer for breach of the collective bargaining agreement.

At the outset it seems clear that the union's duty of fair representation to those it represents cannot be considered a "contractual" duty because of the contractual relation between the union and the employer. This approach was persuasively rejected in Nedd v. United

5. The Company's argument that the plaintiff's failure to speak with a Company representative within 48 hours of dismissal bars this suit would require a strained interpretation of the collective bargaining agreement resulting in a substantial pyramiding of efforts whose only apparent advantage in a dismissal case would be the insulation of the Company from litigation because of technical oversights by the employee.

Mine Workers, 400 F.2d 103, 105–106 (3d Cir. 1968), which view is surely correct, for, as in our case, the Union's breach was not its mere failure to submit plaintiffs' grievances in compliance with the contract but rather its arbitrary, perfunctory failure to do so.

Another argument for treating plaintiffs' suit as a contractual claim is that it is their obligations of membership in the Union which generate the reciprocal obligation by the Union to perform its statutory duty of fair representation. This duty, however, imposed and defined by federal labor policy, is not capable of being bargained away by workers even though a written contract or union by-laws might so provide. Moreover, the Union, once certified, is the bargaining agent for all employees in the bargain unit, including the non-union employees. It would be bizarre indeed if the non-union employees were considered to have a tort claim for unfair representation, with generally a shorter limitations period, while union members' claims sounded in contract and were thus subject to a longer limitation period.

It might also be argued that the employee's claim against his union should be characterized as a "contract" action whenever the employee's suit also states a claim against his employer for breach of contract, because the principal relief sought is normally reinstatement and back wages from the employer and the union may only be a party in order for the employee to overcome the employer's "exhaustion of contract" defense. However, this view which considers the two

claims as essentially inseparable is also unsatisfactory.

First, it would mean that in a given state, the employee's suit against his union for "unfair representation" would be subject to a different statute of limitations depending on whether the employee had joined his employer in the same lawsuit. More importantly, the "inseparability" rationale does not bear inspection. Obviously quite different evidence and legal argument will be addressed to the two claims. Moreover, the employee may well have a substantial claim for damages against the union which far exceeds the potential recovery against the employer, thereby destroying the premise that the claim against the union is only incidental to the more important breach of contract claim against the employer.

Finally, we detect nothing in the federal labor policy which necessitates this rather strained view of the employee's claim against his union and his employer. While the viability of the grievance procedures erected by the collective bargaining agreement may require the employee to show, as a prerequisite to his suit against his employer, that he was prevented from exhausting those contractual remedies by the union's "unfair representation", Republic Steel v. Maddox, *supra* 379 U.S. at 652–653, 85 S.Ct. 614; Vaca v. Sipes, *supra*, 386 U.S. at 184–185, 87 S.Ct. 903, nothing therein requires that the union actually be *liable* for such breach.[6] Indeed, an employee could sue his employer under § 301 and overcome the "exhaustion" defense by

6. The Company insists that unless the Union is governed by the same statute of limitations as it is, a union may deliberately refuse to press grievances in order to provide the employee who is willing to wait out the Union's shorter statute of limitations with an opportunity to take his claim to a jury in a § 301 suit—with the Union's "unfair representation" conceded but immunized—rather than to an arbitrator at the end of the grievance procedure, which possibility allegedly circumvents our federal labor preference for arbitration. We cannot deny such possibility exists, although such union conduct might constitute either an unfair labor practice, *see* n. 7, or a breach of the labor contract actionable by a § 301 suit by the employer. Moreover, it is difficult to see the real quid pro quo for the employee in such circumstances, for the damages flowing from any contractual breach become more attributable to the union's conduct than to the employer's initial breach. In short, we discount the likelihood while acknowledging the possibility, leaving it to Congress to enact some statute of limitations applicable to both employer and union. *See* text, *infra.*

showing wrongful prevention by the union without ever formally joining the union in that suit. Vaca v. Sipes, *supra*, 386 U.S. at 186, 87 S.Ct. 903; Serra v. Pepsi-Cola General Bottlers, Inc., 248 F.Supp. 684, 688 (N.D.Ill.1965); Rivera v. NMU Pension & Welfare & Vacation Plan, 288 F.Supp. 874, 876 (E.D.La. 1968); *cf.* Czosek v. O'Mara, 397 U.S. 25, 28–29, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970).

We are therefore satisfied that any effort to characterize plaintiffs' suit against the Union as a "contract" action is both unsound and unnecessary in order to effectuate existing federal labor policy. Moreover, the Union's duty seems more akin to, though less rigorous than, the duty of due care normally associated with tort actions. Finally, we detect in *Hoosier Corp.* a distinct preference for the shorter statute of limitations where the question of characterization is a close one and no manifest injustice results from such choice, which preference suggests the tort limitations period in most jurisdictions.

One other possibility must be explored. Since the employee's suit against the union is *not* founded on the labor contract, the suit may not be a § 301 suit and thus *Hoosier Corp.* may not be applicable. Even assuming the plaintiffs' claim against the Union is not a § 301 suit, we think the logic of *Hoosier Corp.* dictates the adoption of express state statutes of limitation in the absence of an express federal limitation period. The question becomes whether there is any express federal limitation period governing an action against a union for breach of its duty of fair representation. Since the Union's breach may be an unfair labor practice,[7] the statutory six-month limitation period for such practices—29 U.S.C. § 160(b)—could be deemed applicable to an employee's suit against the union. However, since Vaca v. Sipes established that federal labor policy does not require that individual suits be preempted simply because the NLRB might also be able to prosecute unions for such conduct, we see no reason why such private litigation *must* be limited by the same period as the NLRB is. By giving individual employees a period longer than the NLRB's six months, we encourage initial recourse to the Board without precluding a subsequent civil suit if the Board refuses to pursue the matter for the individual employee. Moreover, the individual suit is still analogous to an ordinary tort action regardless of the Board's concurrent jurisdiction.

We therefore conclude that plaintiffs' action against the Union in our case is properly characterized as a tort action and is therefore barred by the one-year limitation period for tort claims arising in Puerto Rico. However, as we made clear above, we do not believe that the Union's immunity from suit for the breach of its duty of fair representation has any bearing whatever on plaintiffs' suit against the Company for improper discharge, the "exhaustion" defense having been overcome as to six of these plaintiffs by proof of the Union's breach.

While we are satisfied that the proper legal analysis of the union's and employer's duties in cases such as this requires the imposition of different state statutes of limitations, we are equally convinced that Congress would be well advised to enact a federal statute of limitations to deal with both kinds of claims asserted here.

---

7. Miranda Fuel Co., 140 NLRB 181 (1962), enforcement denied, N.L.R.B. v. Miranda Fuel Co., 326 F.2d 172 (2d Cir. 1963) (*not* an unfair labor practice); Local 12, United Rubber, Cork, Linoleum, and Plastic Workers of America A.F.L.– C.I.O. v. N.L.R.B., 368 F.2d 12 (5th Cir. 1966); cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967) (unfair labor practice); Truck Drivers and Helpers, Local Union 568 v. N.L.R.B., 126 U.S.App.D.C. 360, 379 F.2d 137 (1967) (unfair labor practice).

### The Propriety of the Discharges

■ The issue of the adequacy of the evidence to support the special verdicts that the Company discharged plaintiffs in violation of the seniority clause is a close one. Plaintiffs' counsel failed to resort to pre-trial discovery while Company counsel appears to us to have taken refuge in an ambiguous court order to refuse to make available records of four of the plaintiffs. Plaintiffs' counsel briefed this issue superficially; Company counsel briefed it exhaustively, but, understandably, not with complete objectivity.

Our standards of review are the seniority clause itself [8] and the adequacy of the evidence to support the jury's findings that plaintiffs had carried their burden to show by a preponderance of the evidence that they were as useful as a less senior employee.[9] We require more than a scintilla. See Magnat Corp. v. B&B Electroplating Co., 358 F.2d 794, 797 (1st Cir. 1966).

The case for the six plaintiffs who overcame the defense of failure to exhaust contractual remedies consisted of three components. The first was the testimony of each that she deemed herself useful and had no problems with her supervisors, and that a number of retained operators were junior to her. The second was the admission by Mrs. Ramonita Padovani, the Chief Operator for the Company who had made the selection of operators to be discharged, that each plaintiff was a good employee whose return was desirable. The third —and sole source of comparisons between plaintiffs and those who were retained—was the testimony of Mrs. Iris Torres de Hernandez, the former assistant to the chief Mayaguez operator for the Company, who had been laid off seven months prior to the discharges. She offered her individual assessment of each plaintiff and of some eleven other operators, all of whom were less senior than four of the plaintiffs and at least four of whom appeared from the evidence to be less senior than the remaining two plaintiffs.[10] Such testimony tended to prove that all six plaintiffs were as useful as four or more of the less senior employees. In addition, Mrs. Hernandez testified that, in her opinion, these plaintiffs were more useful than the less senior retained operators.

The Company contends that this testimony falls short of a prima facie case for plaintiffs because, in its view, Mrs. Hernandez was completely discredited as a witness. Two reasons of a general nature were asserted: that she had left the Company's service seven months before plaintiffs were dismissed, and that she had originally been a plaintiff in the case. Both factors were obviously relevant for jury assessment of her credibility but do not amount to reason for disqualification. So, too, was her heavy—but not unqualified—emphasis on seniority in assessing usefulness.

The Company more specifically relies on its impeachment of Mrs. Hernandez' testimony regarding three of the plaintiffs—Luz Arminda Toro, Andrea Colon Tubens, and Rosa Figueroa. The discrediting of her testimony as to the first

8. "Seniority shall prevail if the qualifications of all the employees to be considered are equal, but shall not be used against any employee that because of his ability, competence, efficiency and better service record proves to be more useful than some other that has merely been employed for a longer period of time."

9. Plaintiffs continue to argue in brief that defendants had the burden to show that the operators retained were more efficient than plaintiffs. But the charge of the court to the contrary was not excepted to.

10. The jury could have found that Sonia de la Cruz, Elsie Camacho, Perfecta Vazquez and Ruth Soto were all less senior than plaintiff Iris Trabal Quintana, the least senior of these six plaintiffs. The Company, which had the exact length of service of all employees, failed to controvert this testimony of plaintiffs.

two was minor. Her favorable general appraisal of Luz Arminda, an operator for fourteen years, was not necessarily discredited by evidence of two prior critical reports of the latter's performance at a period when operators were under some pressure in converting to a new system. Her favorable assessment of Andrea Colon was not contradicted simply because the latter has missed 200 days of work arising from an illness from which she had since recovered.

The cross-examination of Mrs. Hernandez focused primarily on her evaluation of Rosa Figueroa. Mrs. Hernandez had testified that she had never had any complaints about her. On cross-examination, based on her performance file, Mrs. Hernandez had to concede a series of critical comments in 1961, in 1962, and in 1964. The criticisms made in 1961 and 1962 impress us less on close analysis, partly because they seem for the most part to be minor and technical (e. g., "incorrect busy test on several occasions") and partly because the Company inexplicably omitted all of the comments made as to Rosa Figueroa in 1963—which were generally commendatory. The pattern is consistent with Mrs. Hernandez' observation that she was improving. However, the evidence of criticisms made in 1964, after Mrs. Hernandez had left the Company, is more significant and more adverse. In the first three months of 1964, overall criticism as to Rosa Figueroa's attitude and unbusinesslike conduct were noted, culminating with a serious complaint from a subscriber. These were unrebutted.

In our view this adverse evidence, uncontroverted by plaintiff Figueroa, is so substantial in relation to the favorable evidence that we can only conclude that the jury could not reasonably have found that she was as useful as any of the less senior retained employees. The Company could have attempted to introduce such evidence as to the other plaintiffs, but did not. Insofar as Mrs. Hernandez was impeached, her assessment was destroyed only as to Figueroa, not so much by her statement about lack of complaints as by the evidence of performance after her separation. The evidence is admittedly not so specific or precise as we should like or as could have been obtained through discovery but we think it is sufficient and that the matter should rest with the jury's verdicts, except as to Rosa Figueroa.

## Damages

■■ The Company is therefore liable for damages to all plaintiffs except Rosa M. Figueroa and Elsie Lugo Bernier (*see* n. 3). The Union is immune, because of the running of the applicable statute of limitations, from any liability for its breach. The initial problem is to determine the amount of lost earnings properly chargeable to the Company. Neither the Company nor the Union contested the total amount found by the jury as lost earnings for these five plaintiffs incurred up to the date of judgment.[11]

We look again to Vica v. Sipes, this time for guidance on the allocation of lost earnings where the Company improperly discharges and the Union unfairly represents. *Vaca* establishes that only the Company is liable for damages attributable solely to its breach of contract, while the "increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer." Vaca v. Sipes, *supra* 386 U.S. at 197–198, 87 S.Ct. at 921; *see also* Czosek v. O'Mara, *supra,* 397 U.S. at 29, 90 S.Ct. 770. In a case such as ours, where there has been no suggestion that the Union participated

---

11. | *Plaintiff* | *Lost Earnings* |
|---|---|
| Andrea Colon Tubens | $11,981.93 |
| Iris Trabal Quintana | 6,851.86 |
| Luz Arminda Toro Tirado | 3,454.28 |
| Carmen de la Rose de Ortiz | 2,654.32 |
| Elsie Torres Ramos | 5,628.60 |

in the Company's improper discharge and where there was no evidence that but for the Union's conduct the plaintiffs would have been reinstated or reimbursed at an earlier date, we conclude that the Union's conduct cannot be said to have increased or contributed to the damages attributable to the Company's improper discharge. Thus, the entire amount of lost earnings of each plaintiff, *see* n. 11, is properly charged to the Company.

Additionally, plaintiffs request an award of prejudgment interest on their "lost earnings" recovery. Such interest has been awarded by the NLRB in back pay cases—*e. g.*, Isis Plumbing & Heating Co., 138 NLRB 716 (1962)—and enforced by decisions from at least seven circuits. *See* N.L.R.B. v. Local 138, Operating Engineers, 385 F.2d 874, 878 (2d Cir. 1967), and cases cited therein, n. 22. Courts have also awarded such prejudgment interest in cases where the National Railroad Adjustment Board ordered reinstatement and back pay without mention of any interest recovery. Raabe v. Florida East Coast Railway Co., 259 F.Supp. 351, 356 (M.D.Fla.1966); Dieringer v. Chicago, Milwaukee, St. Paul, and Pacific R. Co., 278 F.Supp. 211, 213 (E.D.Wis.1968); compare Laday v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 299 F.Supp. 580, 581 (E.D.Wis.1969), *affirmed*, 422 F.2d 1168 (7th Cir. 1970).

Such decisions are sound where, in an effort to "make whole" the improperly discharged employee, an administrative agency ascertains actual wages lost and the agency or the court supplements them by interest from the date such wages should have been paid. But where a jury has made an award for lost earnings, we think it inappropriate for a

judge to attempt to assess interest. In many cases the jury's verdict would not supply the basic data of dates and amounts on which interest could fairly be computed. Were we to brook an exception where, as here, the precise computation of the plaintiffs was accepted by the jury, we would in effect be conditioning the right to interest on the happenstance of a precise stipulation precisely followed by a jury. We therefore agree with the action of the district court in refusing to award prejudgment interest.

As compensation for damages incurred *after* the date of the district court's judgment, plaintiffs seek either reinstatement or money damages for future lost earnings, both of which were denied by the district court. Reinstatement has been ordered by various federal courts in suits arising under the Railway Labor Act. *E. g.*, Brady v. Trans World Airlines, Inc., 244 F.Supp. 820, 822 (D.Del. 1965), aff'd, 401 F.2d 87, 102–103 (3d Cir. 1968), cert. denied, International Ass'n of Machinists v. Brady, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969), reh'g denied, 394 U.S. 955, 89 S.Ct. 1272, 22 L.Ed.2d 492 (1969); Raabe v. Florida East Coast R. Co., *supra* 259 F.Supp. at 354. The Company insists, however, that the Norris-LaGuardia "anti-injunction" provisions, 29 U.S.C. §§ 101–115—inapplicable to suits under the Railway Labor Act, Brotherhood of Railroad Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 41–42, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)—bar reinstatement in § 301 suits under the National Labor Relations Act. We disagree.

The Company's literal interpretation of section 4(a) of the Norris-LaGuardia Act [12] completely disregards

---

12. "No court of the United States shall have jurisdiction to issue any * * * injunction * * * to prohibit any person * * * from * * *

  (a) Ceasing or refusing * * * to remain in any relation of employment." 29 U.S.C. § 104(a).

It is possible to read this provision as prohibiting a federal court from enjoining an employer from refusing to reemploy a former employee, even an improperly discharged one.

the primary purpose behind the anti-injunction provisions, "to protect working men in the exercise of organized, economic power * * * to correct existing abuses of the injunctive remedy in labor disputes * * * to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital." Trainmen v. Chicago R. & I. R. Co., *supra* at 40–41, 77 S.Ct. at 640; *see* Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 202–203, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962). Our understanding of the legislative history behind section 4(a) leads us to conclude that that section was not intended as a protection for employers. Brotherhood of Locomotive Engineers v. Baltimore & Ohio R. Co., 310 F.2d 513, 517–518 (7th Cir. 1962), aff'd on other grounds, 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963); Retail Clerks Union Local 1222, A.F.L.-C.I.O. v. Alfred M. Lewis, Inc., 327 F.2d 442, 446 (9th Cir. 1964); *see* Local Union No. 328 v. Armour and Co., 294 F.Supp. 168 (W.D.Mich.1968); *but see* Clune v. Publishers' Ass'n of New York City, 214 F.Supp. 520, 528 (S.D.N.Y.1963), aff'd on lower court opinion, 314 F.2d 343 (2d Cir. 1963). The "remain in any relation of employment" language in section 4(a), which forms the basis of the Company's literal interpretation, was used, we think, simply to make clear that employee strikes could not be enjoined either if the employees claimed to have ceased or refused to work temporarily or if they claimed to have completely ended their employment relation with their employer. Moreover, the drafters did specifically include employers when protection was intended for them. *See* section 4(b), 29 U.S.C. § 104(b). Finally, the reemployment of improperly discharged employees can hardly be said to be one of the abuses sought to be eliminated by the Norris-LaGuardia Act. *See* section 2, 29 U.S.C. § 102; Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 458, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). We therefore hold that the remedy of reinstatement in a § 301 suit is not barred by section 4(a) of the Norris-LaGuardia Act.

Absent Norris-LaGuardia Act restraints, the rationale of Brady v. Trans World Airlines, Inc., *supra,* applies with equal force under the NLRA. We fail to discern any reason why reinstatement is not a perfectly acceptable form of relief for § 301 suits against the employer. *See* Serra v. Pepsi-Cola General Bottlers, Inc., *supra* 248 F.Supp. at 688; Rivera v. NMU Pension & Welfare & Vacation Plan, *supra,* 288 F.Supp. at 877. In many such cases, reinstatement would have been the likely remedy had the grievance been taken through the grievance procedure as it should have been. *E. g.,* International Ass'n of Machinists, District No. 8 v. Campbell Soup Co., 406 F.2d 1223 (7th Cir. 1969). It is unrealistic to assume that the injury to the improperly discharged employee continues only up to the date of the district court's judgment. In the normal case, reinstatement constitutes one form of prospective relief which has some assurance of making the employee whole while avoiding the difficult problem of quantifying future lost earnings.

By concluding that reinstatement is an appropriate remedy in a § 301 suit, we do not mean to suggest that it must be ordered in every such case. First of all, there may be some cases in which no prospective relief is warranted.[13] Yet

---

13. *E. g.,* where the employer can demonstrate that the employee would have been properly discharged at some point prior to the date of judgment, or where it appears that the employee had by the date of judgment obtained equivalent employment which mitigated all prospective injury from the improper discharge, neither of which has been suggested by the Company as having occurred in our case. The Company's sole contention in this regard, that no prospective relief should be granted because there was no evidence that plaintiffs were *still* as useful as some less senior employees who were retained in 1964, must be rejected. Even assuming

in our case the jury's total award for lost earnings to the date of trial has not been contested, and since there was no evidence that the "loss of employment" injury suffered by plaintiffs as a result of their wrongful discharge suddenly ceased on the date of judgment, it seems likely that plaintiffs' injury continued even after the date of judgment and that some form of prospective relief is appropriate.

Reinstatement still may not be the appropriate form of prospective relief in this case, however, for it may be that the six year delay since discharge has made reinstatement impractical both for the Company and for the plaintiffs, particularly if the present seniority clause is a weak one which is likely to generate future controversy concerning these employees. If such impracticality exists, we can see no reason why an award for future lost earnings would not be in order, Thompson v. Brotherhood of Sleeping Car Porters, 367 F.2d 489, 494 (4th Cir. 1966), cert. denied, 386 U.S. 960, 87 S.Ct. 1019, 18 L.Ed.2d 110 (1967),[14] provided they are apportioned between the Union and the employer along the guidelines of Vaca v. Sipes, *supra* and Czosek v. O'Mara, *supra*. Moreover, we think it makes good sense

to give the district court an alternative to reinstatement in those cases where some prospective relief is warranted.[15] Textile Workers Union of America v. Lincoln Mills, *supra,* 353 U.S. at 456–457, 77 S.Ct. 912. The admittedly difficult problems of quantifying future lost earnings should not be allowed to preclude any prospective remedy or to force the parties to accept the more drastic remedy of reinstatement. Of course the employee will only be entitled to recover from the Company for those damages which are reasonably attributable to the discharge and which could not have been mitigated by engaging in substantially equivalent employment.

In this case it is unclear why the district court denied any form of prospective relief. We therefore remand this aspect of the damages question for the district court either to order reinstatement or to submit to a jury, after the taking of evidence, the question of the amount of future lost earnings.

■  Plaintiffs also seek an award of reasonable attorney's fees. While federal courts have awarded attorney's fees as a part of the successful plaintiff's recovery in the labor relations context in the absence of express statutory authorization [16] and while we are inclined to

that plaintiffs were no longer as useful, the Company cannot take advantage of its own wrongdoing, for *it* created the situation where some present employees continued to work in place of these plaintiffs who were wrongfully discharged. In similar circumstances, the Third Circuit upheld a lower court order requiring the employer, under much more extreme conditions of obsolescing skills, to train the improperly discharged employee if necessary to return him to the position he would have attained had he not been discharged. Brady v. Trans World Airlines, Inc., *supra,* 401 F.2d at 103.

14. *See also* Nichols v. National Tube Co., 122 F.Supp. 726, 732 (N.D.Ohio 1954), rev'd on other grounds, United States Steel Corp. v. Nichols, 229 F.2d 396 (6th Cir. 1956). Nothing in either Walker v. Southern Railway Co., 237 F.Supp. 278 (W.D.N.C.1965), or Gass v. National Container Corp., 171 F.Supp. 441 (E.D.

Ill.1959), persuades us that the Fourth Circuit's *Thompson* decision should not be followed. While *Vaca* may indicate a different apportionment of damages than that made in *Thompson*, nothing in *Vaca* suggests that properly apportioned future damages are an improper remedy.

15. We recognize that the record below contains little evidence from which future damages could have been calculated. However, there was sufficient evidence to justify a reinstatement order. Since the case must be remanded for new consideration of the propriety of reinstatement, we think it would be unfortunate both for the Company and the plaintiffs if the district court were forced to choose between reinstatement and no prospective relief in a case where some such relief seems warranted.

16. *E. g.,* Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473, 481 (4th Cir. 1951) (attorney's fees awarded to employee for

think that such relief could be appropriate in a § 301 suit such as this one,[17] we think the circumstances presented in this case preclude such relief. Normally such relief should be charged against the union, for its failure to utilize the grievance procedure on the employee's behalf is what necessitated his resort to the Courts. However, in our case the Union is immune from liability because of the statute of limitations, and we can find no substantial evidence that the Company could be said to have frustrated the grievance procedure with regard to the plaintiffs still before us. For these reasons, the court's denial of such award is affirmed.

Finally, we are satisfied that the plaintiffs' request for "mental damages" was properly denied. We think this is a matter of federal labor law and while we can conceive of extreme conduct by either the employer or the union which might in some cases warrant such an award, it seems clear that ours is not that exceptional case. *Cf.* Brady v. Trans World Airlines, Inc., 244 F.Supp. at 822.

The case is remanded to the District Court to enter judgment against the Company for past lost earnings in accordance with this opinion and to determine the propriety of reinstatement or future lost earnings.

union's breach of duty of fair representation) ; Gartner v. Soloner, 384 F.2d 348 (3d Cir. 1967), cert. denied, 390 U.S. 1040, 88 S.Ct. 1633, 20 L.Ed.2d 302 (1968) (attorney's fees to union member under § 102, LMRDA) ; Sheet Metal Workers, International Association Local 223 v. Atlas Sheet Metal Co., 384 F.2d 101, 109–110 (5th Cir. 1967) (attorney's fees awarded to employer under § 303, NLRA) ; Gulf Coast Bldg. & Const. Trades Council v. F. R. Hoar & Son, Inc., 370 F.2d 746, 748 (5th Cir. 1967) (same).

17. Mr. Justice Black, dissenting in Vaca v. Sipes, *supra* 386 U.S. at 210, 87 S.Ct. 903, eloquently described the difficult route left open to the employee in this predicament. Moreover, the alleged

wrong inflicted on the employee, loss of employment in violation of contractual rights; the anticipated recovery, perhaps too insubstantial to sustain competent counsel's best efforts to obtain redress; and the ultimate purpose behind any recovery in such a case, making the employee whole, all suggest that the employee may need some financial assistance to press his claim and, if successful, should retain a substantial portion of the jury's "lost earnings" award for himself. Finally, the cost of attorney's fees is an injury to the employee directly attributable to and necessitated by the failure of the union and/or the employer to utilize the contractual grievance procedures designed to remedy breach of contract claims without resort to the courts.