**Gerald W. BYRNE, Plaintiff,**

v.

**BUFFALO CREEK RAILROAD COMPA-
NY and John J. Hayes, as Chairman of
Local 12, a Local Unit of United Trans-
portation Union, Defendants.**

Civ. No. 75–271E.

United States District Court,
W. D. New York.

April 12, 1982.

Michael Beilewech, Jr., Buffalo, N. Y., for plaintiff.

Courtland R. LaVallee, Buffalo, N. Y., for Buffalo Creek R. Co.

Robert Boasberg, Boston, N. Y., for Hayes.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

The Complaint in this case states two causes of action. The first is against defendant Buffalo Creek Railroad Company ("Buffalo Creek") for its alleged wrongful refusal to reinstate plaintiff in his employment following a medical leave of absence. The second is against defendant John J. Hayes in his official capacity as Chairman of Local 12, a local unit of the United Transportation Union ("UTU"), for alleged failure adequately to represent plaintiff when he attempted to gain such reinstatement. This court has jurisdiction over both causes of action under the decisions in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and *Glover v. St. Louis-S. F.R. Co.*, 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969).

After a non-jury trial and submission by the parties of proposed findings of fact and conclusions of law and replies thereto, I ordered that additional briefing and argument by counsel be had on the issues (1) whether plaintiff is estopped from claiming present ability to perform the duties of a locomotive engineer by reason of his 1977 application for and subsequent receipt of Social Security and Veterans Administra-

tion non-service disability benefits pursuant to 42 U.S.C. § 423 and 38 U.S.C. § 521, applying the doctrine of "judicial estoppel" discussed generally in 1B Moore's Federal Practice ¶ 0.405[8], and (2) whether, assuming arguendo that plaintiff has proven the liability of defendants herein, an appropriate remedy would include the submission of plaintiff to examination by a neutral physician to be selected by the parties or by the court.

■ Having carefully considered the first matter on which I directed further argumentation, I have concluded that it would be inappropriate at this time, after the trial of this case, to afford defendants the advantage of the affirmative defense of estoppel, which was not pleaded as such in their answers as required by Fed.R.Civ.P. rule 8(c) or at any time argued by defendants prior to my Order directing such argument. No evidence has been presented regarding plaintiff's application for and receipt of these benefits, save plaintiff's oral admissions of these matters upon direct and cross-examination at trial (Tr. 130, 131, 192–194).

■ While late amendment to add an affirmative defense may be granted "when there is no prejudice and fairness dictates," (*Jakobsen v. Massachusetts Port Authority*, 520 F.2d 810, 813 (1st Cir. 1975)), the stricture of Fed.R.Civ.P. rule 15(a) that leave to replead should be "freely given when justice so requires" must be taken to mean justice to *both* parties (*Pollux Marine Agencies v. Louis Dreyfus Corp.*, 455 F.Supp. 211, 215 (S.D.N.Y.1978)). Addition after trial of an affirmative defense which if meritorious would be largely dispositive of a plaintiff's claim and would provide appropriate grounds for summary judgment would be unfair to the plaintiff, because he needlessly would have proceeded to the expense and personal burden of trial. In this case the injustice to plaintiff would be even greater because it was plaintiff's unsuspecting attorney, on direct examination, who first brought to light the facts of plaintiff's application for disability benefits. Although plaintiff's apparent taking of inconsistent positions regarding his ability to work can hardly be condoned, fairness in the conduct

of judicial proceedings militates against permitting amendment to plead such conduct as an affirmative defense under such circumstances.

I am guided to this conclusion also by my perception that the United States Court of Appeals for the Second Circuit disfavors the extension of estoppel principles to positions previously taken before administrative agencies unless the elements of collateral estoppel are otherwise satisfied (*see Roth v. McAllister Bros., Inc.*, 316 F.2d 143, 145 (2d Cir. 1963); *Stella v. Graham-Paige Motors Corporation*, 259 F.2d 476, 482 (2d Cir. 1958). *Cf. Gleason v. United States*, 458 F.2d 171, 175–176 (3d Cir. 1972)), which is inapropos of the case here.

Buffalo Creek's motion to amend its Answer by adding the affirmative defense of judicial estoppel is accordingly hereby ORDERED denied.

*Findings of Fact and Conclusions of Law*

Byrne began working for Buffalo Creek in 1961 as a fireman-engineer and after four years had advanced to the position of engineer. In February 1969 he entered the hospital for an appendectomy and while there experienced a massive hemorrhage, requiring performance of a total colectomy and a permanent ileostomy. By the latter procedure a permanent opening was made in plaintiff's side for the evacuation of his bowels into a sac fitted to this aperture and worn at all times.

After a recuperation period of several months, plaintiff's personal physicians, Dr. J.B. (who had performed plaintiff's surgery) and Dr. W.B., examined plaintiff and determined that he was fit to return to his employment. Plaintiff had received assurances from Trainmaster Terrance Farrell, Buffalo Creek's employing officer, and from Joseph Downey, defendant Hayes's predecessor as UTU's general chairman, that he would be returned to his job after recuperating. After being assured by his doctors that he was prepared to return to work, plaintiff visited Farrell who arranged for his examination by Buffalo Creek's local physician, Dr. S.M.

This doctor assured plaintiff that there was no physical obstacle to his return to

work, but informed him that the decision that he was qualified to do so must be made by Dr. W.M., Buffalo Creek's Chief Surgeon, to whose office in Cleveland Dr. S.M. would report his medical findings. After seeing Dr. S.M. plaintiff spoke to Downey asking for assistance in returning to work as soon as possible, and was told that nothing could be done before the Chief Surgeon had acted upon Dr. S.M.'s report. Plaintiff also wrote to Railroad Superintendent C.M. Johnke July 1, 1969 seeking an appointment for the purpose of discussing his return to work. (Plaintiff's Exhibit 1).

In his report to the Chief Surgeon (Defendant's Exhibit 5), Dr. S.M. indicated the surgical procedures plaintiff had undergone, that plaintiff had four to five bowel movements daily and that plaintiff had regained the fifty pounds he had lost through his illness and subsequent operations. He remarked that, due to the number of daily bowel movements, perhaps he should be placed in some capacity other than that of an engineer. Said report was received by the Chief Surgeon July 7, 1969. On July 22, 1969 the Chief Surgeon wrote to Johnke informing him that plaintiff "is disqualified for all service." (Plaintiff's Exhibit 2.) Upon learning of this communication in early August through his inquiries at Buffalo Creek's office, plaintiff contacted Downey who promised to investigate the matter for plaintiff. On August 9, 1969, in a letter (Plaintiff's Exhibit 3) that Downey admitted he "may have received" (Downey deposition 20), plaintiff wrote "I protest this action [his disqualification] and submit a grievance to you, Chairman Downey, Lodge 12, U.T.U., to initiate steps or procedures under Art. 27 of our Union Agreement which provides for an examination by [Chief Surgeon W.M.] of Cleveland and/or a neutral physician chosen by my physician and the Chief Surgeon [W.M.]."[1] Plaintiff

---

1. Article 27 of the collective bargaining agreement between UTU, of which plaintiff was a member at all relevant times, and Buffalo Creek provides the mechanism for contesting medical disqualifications by Buffalo Creek. The Article reads in full:

"Buffalo Creek Railroad requires certain physical reexamination. Effective September 1, 1949, when an employee is directed by the Company to report to the Chief Surgeon at Cleveland, Ohio for reexamination, he will be reimbursed by the railroad company for any reasonable traveling expenses incurred in the trip. When an Employee loses pay in traveling to or from the Chief Surgeon's office at Cleveland, Ohio, he will be allowed compensation, exclusive of overtime (not a part of regular assignment) or other arbitrary payments, for each day on which pay is lost.

"These payments for traveling expenses and wage loss incurred will not be made when reexamination in the Chief Surgeon's office is at the request of the employee or his representative or results in disqualification.

"Upon request of the employee the Chief Surgeon will submit a report of the medical findings to the employee's family physician. If, after consultation with his family physician, the employee desires, the Chief Surgeon will furnish him a report covering his examination in layman's language. If an employee is dissatisfied with the action taken by the Chief Surgeon as a result of this physical examination, the General Chairman may progress the matter with the Chief Surgeon and upon presentation of written authorization by the employee, the Chief Surgeon will make available and explain to the General Chairman, the medical findings in the case. If still dissatisfied, the General Chairman may arrange with the Chief Surgeon for further handling of the case between the Chief Surgeon and the employee's family physician. If thereafter it is desired to further progress the case, the Chief Surgeon and the family physician of the employee will arrange for a neutral physician (qualified as an expert in the field of medicine concerned and qualified by the American Board or equally rated society) who will reexamine the employee. The decision of this neutral physician will be considered final. Any expense incidental to reexamination by this neutral physician will be divided equally between the two parties. The expense of the respective medical appointees (other than the neutral physician) will be borne by the party selecting the physician. If, in the opinion of the neutral physician, the employee's condition was not such as to render him unfit to perform his usual duties, he will be reinstated and compensated for wage loss suffered. Should the decision be adverse to the employee and it later develops, through medical findings, that his physical condition has improved, a reexamination will be arranged upon the request of the employee or his representative.

"In case an Engineman or Fireman is given physical reexamination by local physician and held out of service for further examination by Chief Surgeon and such Engineman or Fireman is qualified for service, he will be paid time lost, exclusive of overtime with the understanding that payments for time lost

also reminded Downey that his doctor had approved him for any type of work and plaintiff asked to be informed if he could be of any assistance in Downey's efforts on his behalf. On August 10, 1969, by a letter (Plaintiff's Exhibit 4) which Downey testified that he believed he had read (Downey deposition 23), plaintiff's wife expressed her inability to comprehend Downey's refusal to represent plaintiff in his effort to gain reinstatement, described her family's destitute circumstances and begged Downey either to utilize the proper procedures himself for plaintiff or to refer plaintiff to someone in the union with the capacity to process his grievance.

Plaintiff made numerous other contacts with Downey regarding the progress of his claim for reinstatement and Downey spoke informally to various railroad officials other than the Chief Surgeon.

On September 18, 1969 plaintiff's doctor, Dr. J.B., wrote to the Chief Surgeon expressing his belief that plaintiff was fully able to return to his former work and requesting the Chief Surgeon's views on the subject. (Plaintiff's Exhibit 7.) On October 29, 1969 the Chief Surgeon replied to Dr. J.B. to the effect that a permanent ileostomy "is considered disqualifying in train and engine service," which "is an accepted standard by the Railroad Retirement Board also." (Plaintiff's Exhibit 9.)

On September 5, 1969 plaintiff's attorney had advised Buffalo Creek that plaintiff contested the Chief Surgeon's disqualification of plaintiff and requested re-examination by the Chief Surgeon pursuant to Article 27. (Plaintiff's Exhibit 5.) On October 27, 1969 plaintiff's attorney wrote to the Chief Surgeon explaining that the railroad had not responded to his efforts to have plaintiff re-examined and requesting such re-examination. (Plaintiff's Exhibit 8.) This request was repeated by plaintiff's at-

torney by letter dated November 5, 1969. (Plaintiff's Exhibit 10.) In this letter, evidently in view of the contents of the Chief Surgeon's October 29th letter to plaintiff's doctor indicating the Chief Surgeon's inflexible view that an ileostomy is *per se* disqualifying in train service, plaintiff's attorney suggested that the consideration of plaintiff's claim might be advanced directly to the appointment of a neutral physician pursuant to Article 27.

On November 10, 1969 the Chief Surgeon wrote to Johnke inquiring whether Johnke wished to have the Chief Surgeon examine plaintiff pursuant to plaintiff's attorney's request. (Plaintiff's Exhibit 11.) The Chief Surgeon on November 14th requested Johnke to have plaintiff report for an examination in Cleveland. (Plaintiff's Exhibit 12.) However, on November 21, 1969, the Chief Surgeon wrote to Mr. R.A. Carroll, a labor relations employee of the railroad, asking if plaintiff's examination should be cancelled in light of Johnke's remarks in a letter to the Chief Surgeon dated November 13th. Johnke's letter is quoted by the Chief Surgeon as indicating that Johnke considered that the Chief Surgeon's October 29th letter to plaintiff's doctor "entailed sufficient cause for disqualification" and that Johnke did not see any purpose in an additional examination. Johnke also is quoted as indicating that he did not desire another physical examination by the Chief Surgeon because no request therefor had been made by Downey and that the cost of any such further examination would have to be "borne by other than the Buffalo Creek Railroad." (Plaintiff's Exhibit 13.)

On January 20, 1970 plaintiff's attorney wrote to Superintendent Johnke, with copies to Downey and the Chief Surgeon. (Plaintiff's Exhibit 14.) This letter recited the history of plaintiff's efforts to return to

making trip to Chief Surgeon under letter agreement dated September 15, 1949, will apply against such time lost. No allowance will be made if the examination by Chief Surgeon results in disqualification. This memorandum of agreement shall become effective September 8, 1952 and shall remain in full force and effect until changed in accord-

ance with the provisions of the Railway Labor Act, as amended.
"This understanding will not apply in cases involving personal injuries sustained in the service of the Company.
"The above may not be changed or cancelled except in accordance with the provisions of the Railway Labor Act, as amended."

work, noted that the same indicated "that the General Chairman does not wish to further progress this case under that Article [27] by arranging further handling between the Chief Surgeon and [plaintiff's doctor]," and demanded that the Chief Surgeon be instructed to proceed with plaintiff's doctor to select a neutral physician for a final determination of plaintiff's ability to return to work.

On April 6, 1970 plaintiff's attorney wrote to Downey indicating that there had been no response to the January 20th letter and asking him "to take the proper steps under Article 27 of the agreement to have a neutral physician appointed" so as to avoid the necessity of a lawsuit in which UTU would be joined as defendant. (Plaintiff's Exhibit 15.)

Downey testified at his deposition that he had made numerous informal efforts to get the railroad to change its position concerning plaintiff's disqualification, but that he never had requested the appointment of a neutral physician pursuant to Article 27 because plaintiff never had given him written authorization to receive the Chief Surgeon's medical findings, which authorization was in Downey's view a necessary prerequisite to advancement to the appointment of a neutral physician under Article 27. (Downey deposition 21, 31, 39–40, 50 & 51.) Downey testified that it was for this reason that he had ignored the April 6th letter of plaintiff's attorney to him. (*Id.*, at 38–39.) Downey further testified that he had never asked plaintiff to give him the authorization that Downey had felt he needed in order to go ahead, stating that it was plaintiff's job to give him the authorization and that plaintiff should have known that it was his burden because plaintiff had or should have had a copy of the collective bargaining agreement. (*Id.*, at 32, 49–50.) Downey testified that he did not believe that he ever had asked plaintiff to give him any written document. (*Id.*, at 53.) However, Downey also testified that he was not sure whether he had ever advised plaintiff to give him written authorization to receive the Chief Surgeon's medical report. (*Id.*, at 32, 50–51.)

Downey's testimony to the effect that he never had instructed plaintiff to furnish Downey with written authorization to receive the Chief Surgeon's medical findings is consistent with plaintiff's testimony and the other evidence submitted by plaintiff, particularly his exhibits 3 and 4 which are described above and the authenticity of which I accept and which evidence a definite lack of solicitude on Downey's part. I conclude that Downey had received and had read both letters. In view also of plaintiff's evident eagerness to take any necessary steps to regain his employment, it is inconceivable that he would have failed to give Downey said authorization had Downey indicated its necessity. Therefore I conclude that Downey did not so instruct or advise plaintiff. The rest of the contents of Downey's deposition, as set forth above, I take to be true to the extent that the same describes Downey's actual conduct or his beliefs regarding the Article 27 procedure.

Plaintiff commenced this lawsuit July 8, 1975. The action was timely commenced under the six-year statute of limitations applicable to plaintiff's claims against both defendants. *Abrams v. Carrier Corporation*, 434 F.2d 1234, 1252–1253 (2d Cir. 1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971).

I am aware that, recently in *Flowers v. Local 2602 of the United Steel Workers of America*, 671 F.2d 87 (2nd Cir. 1982), the United States Court of Appeals for the Second Circuit has indicated that, where an employee's action against the employer for wrongful discharge is barred by application of New York's 90-day limitations period for an action to set aside an arbitration award, the limitations period applicable to the related claim against the union for breach of duty of fair representation is the three-year New York period for the bringing of nonmedical malpractice suits. Inasmuch as the claim against the union in *Flowers* was held timely under the three-year period there was no occasion to consider applying the six-year period prescribed in *Abrams v. Carrier Corporation*, and the Court's decision to apply the malpractice period may be regarded as dicta, albeit persuasive dicta.

The *Flowers* court neither explained nor mentioned the apparent inconsistency of its decision with the following flat declaration from *Abrams*:

> "We therefore hold that when a § 301 suit is brought against an employer alleging breach of the collective bargaining agreement in conjunction with a claim that the union breached its fair representation duty to pursue the employee's grievance, the same period of limitations should be applied to both claims." 434 F.2d at 1252.[2]

The court in *Abrams* reasoned that the necessity of proving the breach of the fair representation duty in order to prove the employee's case against the employer for wrongful discharge undercuts "the traditional argument for a short limitation period, that claimants should not be permitted to bring actions based on stale evidence long after the parties had a right to assume that the claim would not be pursued." *Ibid.* The court cited also observations set forth in *Vaca v. Sipes*, 386 U.S. 171, 187–188, 87 S.Ct. 903, 915–16, 17 L.Ed.2d 842 (1967), to the effect that "there would be no sense 'in a rule which would permit a court that has litigated the fault of employer and union to fashion a remedy only with respect to the employer,'" and that applying like time limits to the related claims against employer and union would help obviate difficulties in shaping remedies where fewer than all the concerned parties are joined in one lawsuit before one tribunal. 434 F.2d at 1252.

The *Abrams* reasoning is persuasive, and in view of the dicta quality of the *Flowers* application of the three-year malpractice statute and the possibility that the rationale of the *Flowers* dicta is within the reservations stated in footnote 15 of *Abrams*, I am disinclined to hold that *Flowers* overruled the *Abrams* application of the six-year limitations period to fair representation claims where the related claim against the employer is subject to that limitation period.

The decision in *Flowers* was frankly bottomed on a preference for the *ratio decidendi* of Justice Steven's partially concurring and partially dissenting opinion in *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 71, 101 S.Ct. 1559, 1568, 67 L.Ed.2d 732 (1981). The majority opinion in *United Parcel* held that an action under section 301(a) of the Labor Management Relations Act by an employee against his employer following a proceeding before a union-employer joint panel the decision of which was against the employee and in favor of the employer was most similar to an action to set aside an arbitrator's award and, consequently, subject to New York's 90-day statute of limitations. By that decision the United States Supreme Court reversed the decision of the United States Court of Appeals for the Second Circuit which had held that the six-year statute for actions for breach of contract was applicable. In *United Parcel* the union, also sued under section 301(a) by the employee, had not sought review of the intermediate court's ruling that the employee's action against it for breach of the duty of fair representation also was subject to and timely instituted under the same six-year statute. Certain dicta of the majority opinion in *United Parcel* tenably might be construed as indicating that the 90-day statute was applicable both to the action against the employer and to the action against the union. *See* 451 U.S. at 62–63, 101 S.Ct. at 1563–64. It was solely against this ambiguity in the majority opinion that Justice Stevens "dissented." Justice Stevens wrote that the timeliness of the action against the union was not before the court for determination and that a holding concerning the statute of limitations thereto applicable should be withheld until the issue is squarely presented. 451 U.S. at 75, 101 S.Ct. at 1570.

---

**2.** The footnote to this holding expressly leaves open the possibility that in other situations fair representation claims against a union may be subject to different limitation periods. The court wrote that "it does not follow that the limitation period for breach of contract and contract-related claims will apply to all suits brought against a union by a disgruntled member which are nominally classified within the representation rubric" and that "[i]n each instance the nature of the alleged act of commission or omission on the part of the defendant union must be examined to determine the appropriate federal characterization for statute of limitations purposes." *Ibid.*, n.15.

Justice Stevens himself suggested that the action against the union "is properly characterized, not as an action to vacate an arbitration award, but rather as a malpractice claim" analogous to a proceeding against "a lawyer who negligently allows the statute of limitations to run on his client's valid claim [who] may be liable to his client even though the original defendant no longer has any exposure." *Id.*, at 74, 101 S.Ct. at 1570. "[A]rguably," he wrote, "the proper statute of limitations to apply to [a claim against a union for breach of its duty of fair representation] would be N.Y. Civ.Prac.Law [3] § 214(6) * * *, which governs claims for nonmedical malpractice." *Id.*, at 75 n.7, 101 S.Ct. at 1570 n.7. Although the jurist was careful to point out that he was expressing no definite opinion on the point "[b]ecause the question of the appropriate statute of limitations to apply to [the employee's] claim against his union is not properly presented in this case" (*ibid.*), Justice Stevens's reasoning is persuasive both to me and was to our appellate court. Unfortunately, like our appellate court in *Flowers*, Justice Stevens had no reason to consider whether a longer limitations period than the three-year New York nonmedical malpractice period should apply to the claim against the union where the related claim against the employer survives for six years.

In *Flowers* the employee had sued both his employer and his union under section 301(a) following his unsuccessful arbitration hearing and the Court of Appeals had ruled that the six-year statute applied to each. Both defendants gained review by the United States Supreme Court which by summary order remanded the causes to the United States Court of Appeals for the Second Circuit "for further consideration in light of" its decision in *United Parcel*. The *United Parcel* decision was squarely controlling in *Flowers* as to the time limitations for bringing the action against the employer, eleven months having elapsed since the arbitration decision; however, the appellate court adopted Justice Stevens's position that the cause of action against the union

was not to be likened to an action to vacate an arbitration award. 671 F.2d at 90. The appellate jurists then properly proceeded to decide further that such cause of action is not governed by the six-month statute of limitations found in section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), rejecting the position urged in the separate but concurring opinion of Justice Stewart in *United Parcel*, 451 U.S. at 65, 101 S.Ct. at 1565.

The applicability of both the 90-day and six-month periods of limitation having been thus foreclosed there probably was not any necessity for the court to rule further in *Flowers*. The action against the union had been instituted within eleven months of the arbitration decision (the accrual point for the action for the union's breach of the duty of fair representation), and there would seem to be no other potentially relevant statute of limitations having a period of less than eleven months. Nonetheless, noting that "an action for breach of the union's duty fairly to represent its members *at arbitration proceedings* is closely analogous to an action for attorney malpractice" and that the court's task in cases of this sort as stated in *United Parcel*, 451 U.S. at 60, 101 S.Ct. at 1562–63 "is to determine which limitations period is 'the most appropriate one provided by state law,'" the appellate court proceeded to conclude that the state three-year nonmedical malpractice period applied and that the action against the union in that case was therefore timely commenced. 671 F.2d at 91. (Emphasis supplied.)

■ Despite the omission in the opinion of any reference to *Abrams*, the *Flowers* directive is certainly to be followed in cases where no action against the employer may be brought due to the Supreme Court's *United Parcel* decision. The jurists had taken note that they had earlier held the six-year statute to be controlling and their lack of reference to such statute as a third alternative was presumably intentional, which strongly implies that the longer period was held not applicable. Moreover, the

---

**3.** Sic. (should be N.Y.Civ.Prac.L. & Rules).

*Flowers* rationale can be reconciled with *Abrams* on the basis that *Abrams*' application of the six-year contract statute was premised on the survival of a contract action against the employer for that period. Nevertheless I must struggle with a difficult question: is the instant case controlled by *Flowers* and *United Parcel*? I hold that it is not because (a) the instant case involves no prior arbitration proceedings or award, (b) the policy favoring the reaching of decisional finality and tranquility as quickly as practicable in order to preserve sound and peaceable labor relations (*see Machinists v. NLRB*, 362 U.S. 411, 428, 80 S.Ct. 822, 832–33, 4 L.Ed.2d 832 (1960)), is little, if at all, implicated here and (c) there is a policy and urging in dealing with railroad employees' claims for relief for work injuries and other employment complaints that the courts should encourage and succor such claims and not be restrictive thereof (*cf. Czosek v. O'Mara*, 397 U.S. 25, 27, 90 S.Ct. 770, 772, 25 L.Ed.2d 21 (1970). If the instant plaintiff is to be barred because he waited longer than three years after his cause of action had accrued to institute this lawsuit, it is preferable in the present decisional matrix that such be the ruling of the appellate court and not of a district court.[4] Accordingly defendant UTU's motion to dismiss plaintiff's suit as untimely commenced is hereby ORDERED denied.

The doctrine of laches should not be applied to defeat an otherwise timely claim absent extraordinary circumstances, *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 799 (2d Cir. 1974). UTU's belated motion to dismiss on the grounds of laches is accordingly also hereby ORDERED denied.

In a proceeding before the Magistrate in this case, the parties agreed to have plaintiff examined by a neutral physician chosen by Buffalo Creek's successor-in-interest and by plaintiff's doctor, on the understanding that plaintiff would discontinue this lawsuit should the neutral physician find that plaintiff is presently unfit to return to his former employment. There was no stipulation restricting the use of the neutral doctor's report to this purpose only, and at trial his report was received as evidence of plaintiff's present qualification for his former work with the acquiescence of counsel for Buffalo Creek. (Tr. 327, 374.) This doctor's report of May 31, 1979 (Plaintiff's Exhibit 17) concludes with the paragraph:

> "Although I cannot comment as to his employability in the past, at the present time I would consider him fully employable for any job that he chooses to do. There is no evidence of any disability. The fact that he has an ileostomy should be of no limiting factor to employment."

4. It is to me inconceivable that the *Flowers* panel was oblivious to the court's earlier holding in *Abrams*. They had reversed the district court's determination "based on this court's decision in *Mitchell v. United Parcel Service* [624 F.2d 394 (1980)]." The *Flowers* panel must have had its own decision in *Mitchell* in mind, because the jurists noted that the United States Supreme Court had remanded *Flowers* for further consideration in light of its decision on review of *Mitchell*. In *Mitchell* when it was decided by the United States Court of Appeals for the Second Circuit, the court said that "we turn *first* to our decision in *Abrams*" (emphasis supplied) and quoted therefrom that the periods of limitation should be the same for both and that the proper limitation period in *Abrams* was six years. "The factual claims underlying the § 301 action in *Abrams*," the *Mitchell* panel said, "were the same as those in the instant case, namely, a wrongful discharge by the employer coupled with a bad faith failure by the union to represent the employee adequately in discharge proceedings." *Mitchell v. United Parcel Service*, 624 F.2d at 396–397. The opinion continues as follows:

> "The only difference between *Abrams* and the instant case is that here the employee was terminated after his grievance was rejected at arbitration, whereas in *Abrams* the grievance was not taken to arbitration. Citing this difference, appellees urge that we apply a different statute of limitations to the § 301 action in this case than the six year statute of limitations which we applied to the § 301 action in *Abrams*. We do not believe that such a fractionalized approach to § 301 wrongful discharge actions is warranted." *Id.*, at 397.

*Sub silentio* the United States Court of Appeals for the Second Circuit has overruled its *Abrams* holding that the statute of limitations must be the same for the union and for the employer in section 301 cases and has left for a case by case determination what period shall apply.

I therefore take it as established that plaintiff is presently qualified for his former employment with Buffalo Creek.

Because of the neutral doctor's failure to comment on plaintiff's employability in the past, it was determined at trial, during the testimony of plaintiff's doctor, Dr. J.B., that there should be a continuance for the purpose of having Dr. J.B. examine plaintiff to determine whether there had been any material change in plaintiff's condition since the period of Dr. J.B.'s treatment of plaintiff (1969 to 1971). After performing such examination, Dr. J.B. testified that plaintiff is presently in "the same perfect health that he was, as far as my notes are concerned, in 1971" and that there were no signs such as scoriation around the ileostomy to indicate that plaintiff's physical condition had been different at any time since 1971. (Tr. 470–471.) Dr. J.B. further testified that, in the interim between plaintiff's operation in 1969 and his last examination by Dr. J.B., plaintiff experienced only "very, very minor complications" from his surgery, in the form of several minor abscesses. (Tr. 474.) Dr. J.B. also firmly testified that there could be no reasonable difference of medical opinion regarding plaintiff's physical ability to perform those duties. (Tr. 482–484.)

The medical evidence offered by plaintiff clearly establishes that, while plaintiff may experience four or five bowel movements a day, as reported by Dr. S.M., plaintiff does not need to leave his post for the purpose of bowel evacuation. If anything plaintiff's operation seems to have made him even more fit for employment requiring long attendance at a post of duty. Nothing has ever been suggested in the course of this trial to support Buffalo Creek's medical disqualification of plaintiff. I therefore conclude that plaintiff is now and at all relevant times has been physically qualified for return to his duties as a railroad engineer.

The foregoing constitutes my findings of fact regarding defendants' liability which, based upon the analysis to follow, I conclude has been established in law. I have accepted the neutral physician's report as supplemented by Dr. J.B.'s testimony as proof of plaintiff's present and past physical qualifications, notwithstanding any variance of the procedures employed from those set forth in Article 27, because of the impossibility of exactly following Article 27 procedures due to the lapse of time and the discontinuation of the position of Chief Surgeon for Buffalo Creek Railroad, and in the interest of avoiding needless further delay and prolongation of these proceedings. To the extent that appointment of a neutral physician pursuant to Article 27 is a part of the remedy to which plaintiff is entitled, my acceptance of Plaintiff's Exhibit 17 and Dr. J.B.'s testimony as proof of plaintiff's past and present physical qualifications constitutes an award of such remedy and is made pursuant to my responsibility to "fashion an appropriate remedy" when a breach of duty by the union and a breach of contract by the employer are proven in cases such as this (*Vaca v. Sipes, supra*, 386 U.S. at 187, 87 S.Ct. at 915).

Buffalo Creek seeks to escape liability on the ground that, in the absence of a request from Downey for action upon plaintiff's claim to reinstatement, Buffalo Creek was under no obligation to proceed to the appointment of a neutral physician. In the absence of a breach of UTU's statutory duty to fairly represent the plaintiff such an argument might prevail. As a general rule an employee who has failed to exhaust the collective bargaining agreement's arbitration procedures has no cause of action against the employer, even if the non-exhaustion of such remedy is due to the union's reasonable failure to invoke arbitration provisions. *Vaca v. Sipes, supra*, at 192, 87 S.Ct. at 917–18. However, in this case there was a breach of the union's duty of fair representation, bringing the matter within the rule that where "the union has the sole power under the contract to invoke the higher stages of the grievance procedure, *and* * * * the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process his grievance," then "the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the

employee can prove that the union or bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Id.*, at 185, 186, 87 S.Ct. at 914.

■ Buffalo Creek also urges that there is no limitation upon its ability to medically discharge an employee except that it must follow Article 27 procedures; in the absence of a failure to follow procedures there can be no wrongful medical discharge of an employee, hence no breach of contract, hence no liability. However, there is a further limitation in Article 27, albeit an implicit one, that Buffalo Creek will not medically discharge an employee absent *good cause*, for without such a limitation the arbitration procedure of Article 27 would be meaningless. I find and hold that Buffalo Creek did in fact discharge plaintiff without good cause therefor, a breach of contract actionable under *Vaca v. Sipes* as explained above.

■ I now turn to consider defendant UTU's conduct respecting plaintiff in relation to the duty of fair representation. "A breach of the statutory duty of fair representation occurs * * * when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes, supra*, at 190, 87 S.Ct. at 916–17. Thus "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." *Id.*, at 191, 87 S.Ct. at 917. In *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 368, 11 L.Ed.2d 370 (1964), it was observed that "[t]he exclusive agent's obligation 'to represent all members of an appropriate unit requires [it] to make an honest effort to serve the interests of all those members * * *.' *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–338 [73 S.Ct. 681, 685–86, 97 L.Ed. 1048]." Applying such considerations, the court in *Retana v. Apartment, Motel, Hotel & El.Op.U., Loc. No. 14*, 453 F.2d 1018, 1027 (9th Cir. 1972), held that a breach of the duty of fair representation may be shown where an employee's failure to exhaust contract remedies is due to the union's failure to advise as to contract rights. *Schum v. South Buffalo Railway Co.*, 496 F.2d 328 (2d Cir. 1974), held that

the union's duty of fair representation had been breached where the union had made preliminary efforts to process the plaintiff's grievance but "made no effort to carry a timely claim to the second step of the grievance procedure," even though the union unsuccessfully sought the company's consent to an extension of the limitations period. 496 F.2d at 329–330.

■ The conduct of the union here clearly constituted a breach of its duty of fair representation under these rules and decisions. Nowhere in Article 27 does it explicitly appear that Downey could not possibly take up the matter of plaintiff's discharge without plaintiff's written authorization. The reasonable implication of the fifth sentence of Article 27, which states the first integral procedural step in the challenging procedure, is that the General Chairman may "progress" the matter with the Chief Surgeon if the employee is dissatisfied with the Chief Surgeon's medical conclusions, and need not present the employee's written authorization for release of medical findings to the General Chairman unless the same is necessary for a meaningful discussion of the employee's condition. Even assuming as I do that Downey in good faith believed that to take this first step required that plaintiff give him the said written authorization, he and the union cannot be excused for his failure to inform plaintiff that such was necessary. Downey's adamant insistence that plaintiff should have known of this prerequisite because he had or should have had a copy of Article 27 is meaningless inasmuch as the alleged prerequisite does not clearly appear to be such. *Cf. Curtis v. United Transp. Union*, 486 F.Supp. 966 (E.D.Ark.1979) (General Chairman's good-faith adherence to customary procedures constitutes actionable "perfunctory representation" where such is inadequate for processing a grievance).

In some cases unions have been excused for failing to process a grievance where the available information reasonably suggests that arbitration would not succeed for the employee. *E.g., Vaca v. Sipes, supra*, 386 U.S. at 193, 194, 87 S.Ct. at 918, 919; *Sim-*

berlund v. Long Island Rail Road Company, 421 F.2d 1219 (2d Cir. 1970); Bazarte v. United Transportation Union, 429 F.2d 868 (3d Cir. 1970). UTU suggests that Downey's failure to process plaintiff's claim is excusable for such reasons, pointing to the decisions of several other employers who subsequently refused plaintiff employment solely because of his ileostomy. However, the only medical evidence known to Downey at the time of his failure to assist plaintiff, other than that of the railroad doctors, was the report of plaintiff's doctor which was wholly favorable to plaintiff's claim for reinstatement. For all that appears, the later, unappealable decisions of other employers who refused to employ plaintiff were themselves as arbitrary and unreasoned as Chief Surgeon W.M.'s decision that plaintiff was per se disqualified for train service; in any case they have no bearing on Downey's failure reasonably to aid plaintiff. UTU's further contention that, due to the use of the verb "may" in Article 27's statement of the General Chairman's responsibilities, Downey was under no obligation whatsoever to act on behalf of plaintiff borders on the frivolous.

■ Having found that Buffalo Creek and UTU are liable to plaintiff for his legal damages as a result of his wrongful employment termination, it remains to determine the extent of such damages and the liability therefor of each defendant. In Vaca v. Sipes, supra, the Supreme Court observed:

"Though the union has violated a statutory duty in failing to press the grievance, it is the employer's unrelated breach of contract which triggered the controversy and which caused this portion [i.e., lost wages] of the employee's damages. * * * "The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer." 386 U.S. at 197–198, 87 S.Ct. at 920–21.

Although the second-quoted sentence invites the conclusion that a union may be liable for wages lost during the period of time for which a decision on the employee's claim is delayed beyond when it would reasonably have been determined had the union fulfilled its duty of representation, in context it must be read as attributing all lost wages solely to the employer's breach of contract. Thus, in Czosek v. O'Mara, supra, 397 U.S. at 29, 90 S.Ct. at 773, the Court indicated that in cases such as these "damages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer." I conclude therefore that the defendant union in the instant case is liable to plaintiff for all attorneys' fees and costs reasonably incurred in the course of his efforts to gain reinstatement to his former employment. Proof as to the amount of such expenses must be submitted as a basis for my determination of the award amount.

Buffalo Creek thus is liable to plaintiff for the lost wages element of his damages. The computation of this element I shall base upon evidence offered by plaintiff at trial of the wages of the Buffalo Creek employee immediately his junior during the period for which lost wages are to be assessed, plus appropriate interest, less amounts the plaintiff earned or should have earned had he exercised due diligence in seeking employment during the relevant period. See, e.g., Pompeo v. Erie-Lackawanna Railroad Company, 346 F.Supp. 1311, 1315 (W.D.N.Y.1972); Raabe v. Florida East Coast Railway Company, 259 F.Supp. 351, 355–357 (M.D.Fla.1966); Louisville & Nashville R. Co. v. Brotherhood of Loc. Eng., 190 F.Supp. 829, 835–836 (W.D.Ky. 1961), aff'd, 297 F.2d 608 (6th Cir. 1961), aff'd, 373 U.S. 33, 83 S.Ct. 1059, 10 L.Ed.2d 172 (1963).

I have concluded that it would be inequitable to grant plaintiff an award of back pay for the extended period in which he inexplicably delayed the bringing of this suit. Plaintiff learned of his wrongful discharge in early August 1969. As late as April 1970 he was still making efforts, by

his attorneys, to achieve reinstatement through the Article 27 procedure. Plaintiff's attorney's letter of April 6, 1970 indicated that, if Downey did not invoke such procedures for plaintiff, a lawsuit would follow. However, suit was not filed until July 8, 1975, mere days before expiration of the six-year limitation period. Had plaintiff acted with reasonable promptness after the April 6th letter—which clearly reflects an appreciation that the contractual remedy was being intolerably frustrated—the question of Buffalo Creek's liability for the long period of delay need never have arisen. A plaintiff in a back pay suit should not be compensated for any period of delay for which he was responsible. *Pompeo v. Erie-Lackawanna Railroad Company, supra*, at 1315.

**5.** Buffalo Creek notes in its memorandum filed February 6, 1981, at page 6, that plaintiff was placed on the payroll of Consolidated Rail Corporation, Buffalo Creek's successor-in-interest, June 19, 1979, pursuant to the agreement between counsel for plaintiff and Buffalo Creek regarding plaintiff's examination by the neutral doctor on whose report I relied above as representing the findings of a neutral physician under Article 27. In back pay suits, "[a]s a rule, the damage period terminates on the date a wrongfully discharged employee is reinstated." *Pompeo v. Erie-Lackawanna Railroad Company, supra*. at 1314. Buffalo Creek will be allowed to offer proof that plaintiff was reinstated as indicated, with duties and compensation commensurate with his former position, and such proof would provide a basis for reconsideration of the amount of plaintiff's damage award against Buffalo Creek.

In keeping with my conclusion that plaintiff may not profit from his long delay in bringing the instant suit, for damage computation purposes the date of his reinstatement should be translated to a date occurring as long after this lawsuit is deemed to have been instituted for such purposes (July 31, 1970) as it occurred after the actual institution of the suit. Plaintiff's reinstatement must in reason be attributed to the prosecution of this lawsuit; hence it is reasonable—and equitable—to presume that had the lawsuit been instituted with reasonable promptness plaintiff's reinstatement would have occurred within the same period of time after the suit began as actually elapsed between the suit's later commencement and plaintiff's reinstatement. Plaintiff will of course be permitted to demonstrate that such a presumption is in fact not reasonable or equitable in the instant case.

Should Buffalo Creek prove plaintiff's reinstatement on June 19, 1979, or three years and 346 days after actual commencement of this

I find that had plaintiff acted with reasonable diligence the instant suit would have been instituted by the end of July, 1970. Adding to that date the period of time consumed by this lawsuit since its inception—approximately six years and eight months—I find that Buffalo Creek is liable to plaintiff for lost wages, to be computed and adjusted as hereafter indicated, from the date of his wrongful disqualification (July 22, 1969) to March 31, 1977.[5]

Plaintiff's proof upon trial, in the form of testimony and Wage and Tax Statements (Form W–2's) of the next senior Buffalo Creek employee establish that had plaintiff not been wrongfully disqualified for employment he would have earned the following amounts in the years indicated:[6]

lawsuit on July 8, 1975, plaintiff will thus be entitled to damages according to the following computation, with subsequent adjustment for mitigating employment:

| | |
|---|---|
| 1969 – | $4,080.61 |
| 1970 – | 11,002.64 |
| 1971 – | 11,890.12 |
| 1972 – | 13,066.00 |
| 1973 – | 14,241.89 |
| 1974 – | 8,152.41 |
| Total | $62,433.67 |

The amount for 1974 is arrived at by transposing plaintiff's alleged reinstatement to a date three years and 346 days after July 31, 1970, the date this lawsuit is deemed commenced for damages purposes, which is July 12, 1974, the 193d day of 1974.

**6.** The amounts entered for 1972, 1973 and 1974 are derived by interpolation between the amounts entered for the years 1971 and 1975. Plaintiff's witness was unable to provide precise figures for the years 1972, 1973 and 1974, but he testified (Tr. 459) that his earnings in these years steadily increased during the period between 1971 and 1975, years for which precise figures were offered. No explanation has been offered for an apparent sharp decrease in wages from 1975 to 1976; because proof of damages is the plaintiff's burden $11,389.63 is taken to be accurate for 1976. The figures in the text for 1969 and 1977 are adjusted to reflect the fact that plaintiff is deemed to have been wrongfully deprived of employment for only portions of those years. July 22nd was the 203rd day of 1969; so plaintiff is entitled to back wages for 162/365ths of $9,193.97, the next senior's wages in 1969, or $4,080.61. March 31 was the 90th day of 1977, so plaintiff is entitled to back wages for 90/365ths of $16,376.45, the next senior's wages in 1977, or $4,038.03.

| | | |
|---|---|---|
| 1969 | – | $4,080.61 |
| 1970 | – | 11,002.64 |
| 1971 | – | 11,890.12 |
| 1972 | – | 13,066.00 |
| 1973 | – | 14,241.89 |
| 1974 | – | 15,417.77 |
| 1975 | – | 16,593.65 |
| 1976 | – | 11,389.63 |
| 1977 | – | 4,038.03 |
| | | |
| Total | | $101,720.34 |

These amounts must be offset by the amounts that plaintiff earned or reasonably could have earned by the exercise of due diligence during the period from July 22, 1969 through March 31, 1977. It clearly appears that plaintiff did such work as he was able and diligently sought employment during this period. However, plaintiff's testimony and Buffalo Creek's contentions regarding plaintiff's income during this period provide no sure means for calculating plaintiff's actual income during this period. Both parties seem to rely upon plaintiff's answers to interrogatories regarding this information, but such were never entered into evidence at trial and therefore cannot be regarded as evidence. Defendant furnished copies of income tax returns filed jointly by plaintiff and his wife for certain of the years in question (Defendant's Exhibits D, E & F), but these do not indicate what portion of the reported incomes are attributable directly to plaintiff. Therefore plaintiff must submit his own affidavit or other suitably attested evidence of his income during the period in question so that the necessary offset can be made. Buffalo Creek shall have fourteen (14) days from the date of receipt of plaintiff's proof to respond to the figures proposed by plaintiff. This Order will thereafter be amended to indicate an award of the appropriate amount to plaintiff, plus interest to be computed at the rate of 6% from the end of each year from 1969 to 1976, running to March 31, 1977. *See Raabe v. Florida East Coast Railway Company, supra,* at 356.

The parties are encouraged if possible to stipulate as to any of the foregoing unsettled matters within the times provided in the next paragraph.

In accordance with the foregoing, plaintiff is hereby ORDERED to move within thirty (30) days of the entry of this Order for an award of attorneys' fees against defendant UTU, with supporting affidavit(s) setting forth the work done and hours spent on plaintiff's behalf. Plaintiff is further hereby ORDERED to submit within thirty (30) days of the entry of this Order to this court and to counsel for defendant Buffalo Creek his personal affidavit and/or other suitably attested evidence as to his personal income, including all wages, remunerations and tips derived from his labor, for the period from July 22, 1969 to April 30, 1976. Defendant Buffalo Creek shall have fourteen (14) days thereafter to respond in writing to plaintiff's proposed offer of proof of such mitigating income.

Defendant Buffalo Creek shall be permitted within thirty (30) days of the entry of this Order to submit evidence to this court and to counsel for plaintiff regarding plaintiff's present employment by Buffalo Creek's successor in interest, proving the duration thereof and plaintiff's wages, for offsetting against plaintiff's back wages award as indicated in footnote 5, supra. Plaintiff shall have fourteen (14) days after receipt of such evidence to respond in writing or by appropriate motion.